UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**REGINALD ABRAHAM,**<br><br>**Defendant.** | Crim. No. 17-CR-10269-WGY |

## GOVERNMENT'S TRIAL BRIEF

On September 6, 2017, a federal grand jury in the District of Massachusetts returned an indictment charging the defendant, Reginald Abraham, with three counts of Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. §§ 1591(a) and (b)(1). On January 31, 2018, the grand jury returned a superseding indictment charging the defendant with an additional three counts of Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. §§ 1591(a) and (b)(1). These charges relate to the defendant's sex trafficking of victims One through Six.[1]

In this trial brief, the government will summarize the evidence it currently expects to present at trial, and note legal issues that it anticipates might arise during trial. Witness preparation and trial planning is ongoing, and the Government reserves the right to make adjustments to its planned trial presentation.

---

[1] The indictments identify the victims only by number (*i.e.*, Victim #1); for ease of reference herein, the government will refer to them by their initials. The victim named in Count Four has died since the date of the superseding indictment was returned. The government intends to dismiss this count.

1

## I. The Evidence

### A. Witnesses

The Government anticipates calling approximately seven witnesses who fall into two categories: victims of and witnesses to Abraham's sex trafficking and prostitution operations; and law enforcement witnesses who will provide relevant information regarding the investigation.

#### a. *Law Enforcement Testimony*

Special Agent Lina Awad from Homeland Security Investigations ("HSI") will testify that in January 2017, she and other agents began to investigate a sex trafficking operation run by Reginald Abraham. Agent Awad will testify that her first contact with Abraham was in October 2015, when she was serving a grand jury subpoena on an alleged victim in a different sex trafficking case. Abraham was with the victim at the time the subpoena was served. Afterwards, Abraham yelled at agent Awad, "This is what I think about your subpoena," as he tore up the subpoena.

After an extensive investigation, investigators identified a number of victims that Abraham trafficked between 2012 and 2016. Agent Awad will testify about various aspects of the investigation, including how the government obtained evidence that led to the charges in this case. Through agent Awad, the government intends to offer evidence obtained via search warrants of defendant's Facebook accounts, email accounts, phones, and residence; records obtained via subpoenas of Backpage.com, banks, hotels, hospitals, and crypto currency accounts. Finally, agent Awad was present during the arrest of the defendant and the search of his residence and vehicle. She will testify about what she perceived and what evidence was seized during the searches.

### b. *Victim Testimony*

The victims named in Counts One, Two, Three, Five, and Six will all testify about their experiences with the defendant. Many of the victims lived with Abraham while he was trafficking them; however, many did not know each other because their contacts with him occurred at distinct times between 2012 and 2016. The victims will testify about the discreet methods Abraham used to recruit them and other women to engage in commercial sex acts for his benefit. For example, Abraham used at least two different Facebook accounts to establish contact with multiple victims, often pretending to be interested in dating them. He also used the women he was trafficking to lure in other vulnerable women. He promised them a free place to stay and drugs. Many of these women began relationships with Abraham unsuspecting that they would be forced to engage in commercial sex. Many were drug addicted when they met Abraham or became addicted by the drugs he supplied to them. The victims will testify that after they were recruited, Abraham turned to using violence, drugs, and fear to force and coerce them to engage in commercial sex.

Abraham used the now defunct online website Backpage.com to post solicitation advertisements of victims he was trafficking and paid for these ads using pre-paid anonymous Visa debit cards. Abraham set the prices the victims charged for commercial sex and established monetary quotas they were required to meet on a nightly basis. If the victims did not meet his quotas, Abraham beat or withheld drugs from them. Abraham selected and controlled the locations where the victims worked and took the money they made. If they met or exceeded his quotas, Abraham rewarded the victims by giving them extra drugs. Sometimes, Abraham drove the victims to hotels around New England for the purpose of engaging in commercial sex, and other times he had the victims drive themselves in cars he rented or owned.

The victims will testify that Abraham had specific and detailed rules that he forced them to follow. For example, they could not go outside the residence during the day; they had to call him when they accepted a prostitution call[2] to inform him how much money they were going to be making, call again when they arrived at the prostitution site, and immediately call him after getting paid; they could not look at or talk to other men when in public; they had to give him all of the money they made and ask permission to make any purchase of anything; and they were given scripts that they had to use when first speaking to Johns who were responding to solicitation advertisements. They will all testify that failure to follow any of the rules resulted in the defendant physically beating them or withholding drugs from them. All of the testifying victims will testify that 1) Abraham beat other victims in their presence; 2) they were brought in to see the injuries sustained by a beaten victim after he was done; or 3) they were told about the beatings after they occurred.

### B. Exhibits

The government intends to introduce several categories of exhibits through the above witnesses, including:

#### 1. Physical Evidence of Prostitution

This evidence will include numerous Backpage.com solicitation advertisements, which were either posted from the internet address associated with the defendant's home or from one of the defendant's identified email accounts, or both; hotel receipts documenting various hotel rooms rented under the defendant's name or the name of one of the victims; defendant's financial records

---

[2] A "call" is street language for a transaction for commercial sex. "Out calls" are when a prostitute goes to a location to meet a buyer of sex (commonly referred to as a "John"). An "in call" is when a John goes to a hotel room that was rented by the prostitute or her pimp.

documenting charges to Backpage.com; emails sent to defendant's three email accounts, which include notifications of charges from Backpage.com, reservation confirmations from hotels, and inquiries from Johns soliciting commercial sex; numerous prepaid Visa cards found in defendant's car and home that were used by him or the victims to rent hotel rooms; and photographs of women's clothing found in defendant's home and car.

### 2. Identification Evidence

The Government will introduce photographs of relevant individuals for witnesses to identify and/or reference in trial. These photographs will be introduced by individuals who know the person depicted. These identifications are admissible under Rule 801(d)(1)(C).

### 3. Text Messages and Facebook Communications

Phone extractions from defendant's cell phones and the phones of K.G. and J.N. show electronic communications (text messages and emails) between the defendant and J.N. (Count Two) and the defendant and K.G. (Count Three). The communications show, among other things, that the victims texted the defendant with details about who was working and where, and to ask his permission to leave a hotel or certain location or to use money to buy food. The communications corroborate the victims' accounts of their subservient roles and the rules that they were forced to follow (*e.g.*, they were required to check in with defendant before and after a call so that he knew who was working and where).

As detailed above, defendant used two Facebook accounts to meet and establish relationships with women prior to trafficking them. These communications expose his modus operandi, which was to lure women into thinking that he was courting them and to establish trust in him. As the victims will testify, after that trust was established, he then turned to brutal beatings, threats, withholding drugs, and other methods of intimidation to force and coerce them to engage

5

in commercial sex. The Government will seek to introduce these statements on the basis that they are not hearsay, because they are statements of the defendant.

**4. Medical Records**

The Government will introduce a redacted medical record of J.N., which documents that she received treatment after defendant burned her face with a lit cigarette.

**5. Photographs/Demonstrative Evidence**

The Government expects to introduce a photograph and video taken by J.N. that shows the hole in her cheek that defendant caused when he burned her with a lit cigarette. The Government may also use one or more chalks, including chalks that depict text messages that were extracted from the cell phones seized from defendant at the time of his arrest and from the cell phones of victims.

**C. Stipulations**

The parties have reached a number of stipulations about the admissibility of certain exhibits that the government intends to offer in its case in chief. The Government obtained and provided defense counsel with business records certifications for the exhibits it intends to offer. The parties agree, pursuant to Federal Rules of Evidence Rule 803(6), that documents from the following categories are admissible as business records: Facebook, Backpage.com, email providers, Comcast, hotels, financial institutions and institutions that deal in crypto currency, and hospitals. Furthermore, the parties agree that the proposed cell phone extraction exhibits are authentic, and neither party will require an expert witness to authenticate them.

**II. LEGAL ISSUES**

The parties have addressed a number of legal issues in its filings and in response to opponent filings. The Government has no opposition to Dkt. Nos. 138 and 139, which seek to

prevent the Government from using a summary witness and introducing expert psychological testimony through law enforcement witnesses. At this time, the Government does not intend to use such witnesses or offer such testimony.

Defense has filed two motions *in limine* (Dkt. Nos. 142 and 146). With respect to the first motion, defense is seeking to admit incident logs and reports from the Dracut Police Department involving the defendant's residence from 2012 to 2017. Defense seeks to enter the logs to show that during the relevant timeframe, none of the victims or *anyone one else* living in that house called 911 to report any type of assault or crime. The Government offered to stipulate that no named victim ever called 911 while involved with the defendant. The government opposes the introduction of the absence of calls from other unknown persons based on relevance and the inability to explain why no such calls were ever made. Without laying such a foundation, the basis for the absence of 911 calls is speculative. Additionally, this is classic reverse 404(b) evidence. Again, defendant cannot - and will not – be able to explain why no such call was ever made. He wants to introduce the absence of calls so he can argue that no 911 calls were ever made to invite the jury to infer that no crimes were being committed. An alternate theory could be that no such calls were ever made because the defendant threatened to harm anyone who made such a call. Thus, this evidence does not tend to make a fact more or less probable than it would be without the evidence.

With regard to the defendant's most recent motion *in limine* (Dkt. No. 146), the parties have reached agreement on most of the issues, and thus, will only need the court to rule on the following:

1) Evidence of defendant's drug dealing not related to the case. The government will only introduce evidence of defendant distributing drugs to the women he was prostituting and trafficking and to the Johns who paid for commercial sex from those women.

2) Any testimony regarding N.L. (an uncharged victim). Agent Awad will testify that when investigators searched defendant's residence, N.L. was present inside the residence. She was pregnant and addicted to heroin. Agent Awad is a percipient witness and the testimony is relevant to the charges in this case.

3) Evidence that defendant belonged to a gang named Zoe Pound. Multiple victims will testify that defendant told them he belonged to Zoe Pound, which he claimed was a violent Haitian gang. This testimony is not being introduced for its truth, but to show that defendant told them he was a gang member to instill fear in them. Further, it is statement of a party opponent under Rule 801.

4) The murder of A.B.D., who was allegedly a prostitute. Victims will testify that defendant talked about the murder and death of A.B.D. and insinuated that the same would happen to them if they left him. This testimony is not being introduced for its truth, but to show that the defendant talked about A.B.D.'s death to instill fear in the victims. Further, it is statement of a party opponent under Rule 801.

5) Any testimony that a testifying witness heard from a third party about defendant's assaults on other women. This testimony is not being introduced for the truth, but rather to show that defendant knew that the women he had beaten would discuss the assaults with new recruits to dissuade them from breaking any of his rules and to instill fear in them. The victims will testify that hearing about the assaults on other victims (charged or uncharged) created an atmosphere of fear, which explains why they did not leave.

6) Evidence of Facebook communications between the defendant and non-testifying third parties. To the extent any communications relate to the charges in this case, they are admissible under Rule 801.

The Court has yet to rule on the Government's opposition (Dkt. No. 127) to the defendant's notice that he intends to offer certain evidence of the victims' sexual behaviors or predispositions, including prior or post prostitution activity, which the government believes is precluded under Rule 412. Finally, the Court has yet to rule on defendant's motion to dismiss the indictment for vagueness (Dkt. No. 110), which the government opposed (Dkt. No. 126).

            *Respectfully submitted*,

            ANDREW E. LELLING
            United States Attorney

     By:  */s/ Leah B. Foley*
            LEAH B. FOLEY
            STEPHEN HASSINK
            Assistant U.S. Attorneys

Date: July 14, 2019

## CERTIFICATE OF SERVICE

  I hereby certify that I caused a copy of the Government's Trial Brief to be served on counsel for Reginald Abraham by ECF.

               */s/ Leah B. Foley*
               Leah B. Foley
               Assistant U.S. Attorney