UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                                        )    CRIMINAL ACTION
        v.                              )    NO. 17-10269-WGY
                                        )
                                        )
REGINALD ABRAHAM,                       )
                                        )
                    Defendant.          )
_____)

YOUNG, D.J.                                     November 2, 2020

### SENTENCING MEMORANDUM

Of the myriad responsibilities of a United States District
Judge, the two most important are presiding over trials[1] and
sentencing offenders.  Although most other judicial functions
can be delegated subject to review, these two are central to the
judicial role and only the trial judge acting alone
appropriately can meet their unique demands.

On March 3, 2020, Reginald Abraham stood before the Court,
convicted by a jury after a full and fair trial of four counts
of sex trafficking by force, threats, fraud, or coercion.

His conduct was accurately limned by Assistant United

---

[1] But see the considered views of my friend Brock Hornby,
The Business of the U.S. District Courts, 10 Green Bag 2d 453,
466-67 (2007), for a different view.

States Attorney Leah Foley:

Reginald Abraham's behavior is that of a
sociopath.  Like other predators he could care less
about the destruction and devastation that he caused,
because somehow he feels entitled to take away the
dignity and self-worth of others.  This is a man who
cannot be rehabilitated.  At his age, to be doing what
he was doing, is an absolute sign of an irredeemable
soul.  There is no one he would not take advantage of.
And what's worse, he knows who he is, which is why he
focused his viciousness on the most vulnerable
victims.  He preyed on these victims because he knew
he couldn't live without the sick pleasures he gained
from destroying them.

We use words to describe the actions that people
do in their lives, the ones that all apply here,
"prey," "beat," "assault," "rape," "manipulate,"
"coerce," "force," these words do not do justice for
what this defendant inflicted on countless victims
over a considerable span of years.  We use adjectives
to embellish descriptions of people and stories.  In
this case there is no embellishment, he is evil, he is
inhumane, and he is dark.

He inflicted unimaginable torture on his victims
both psychologically and physically.  He made T.B.
wear a dog collar and eat out of a bowl because she
had the gall to disobey him.  He beat her so badly,
pistol- whipping her as she urinated on herself, and
then was forced to sleep in that pool of urine to
teach her a lesson.  He told her she was not worth
shooting, because he would then have to get rid of her
body.  Heaven forbid he ever do anything, he always
had others do it for him.

J.N.  She saw the defendant beating K.B. so badly
that her hair had turned bright [b]right red, then he
beat [the] crap out of her because she had the
humanity to check on her.  As a parting gift, he
subjected her to a weekend of being gang raped.  He
locked her there so that the other girls would see
what happens when you try to leave him.  He then put a
cigarette out on her face.

E.S.  You might recall that she was so terrified
to come here and face the man who had beaten and raped
and tortured her that she had to be physically
escorted into the courtroom and onto the witness
bench.  And if that weren't bad enough, to relive the

beatings, the sexual assaults, and watching others being beaten, watching K.B. being walked around like a dog, there were things she couldn't even answer on the stand because it was so humiliating.

K.G. talked about being choked so severely and punched that she had to seek medical attention. She talked about the fact that she would rather be beaten than listen to other people be beaten.

He had a complete psychological hold on his victims. He made them introduce . . . him to their families, so that if they ever revealed who he actually was, no one would believe them.

He pointed guns at them. He led them to believe that he had killed another prostitute and would do the same thing to them if they broke his rules. He separated them from their family. He threatened to hurt their family if they ever attempted to leave him. He kept their personal belongings, when they left him, as if he hadn't already taken enough.

He set the quotas. . . . [Y]ou heard at trial, in the text messages that were introduced at trial, [which] proved that this part of the victim's testimony was absolutely true, they couldn't go home until they reached the quotas. Most times they had to earn between $500 and $1,000 a night. The texts showed that they would often not hit these quotes until the early-morning hours, but they could not go home without earning the money that this man then took from them.

They had to get permission to put gas in their car, to buy food. They had to get permission to live.

He left a trail of destruction that's far and wide. The victims who encountered him are traumatized for life. They can't imagine that they will ever get a random friend request on Facebook or social media and [not] immediately ask themselves, "What is this?" and think back to the day that they fell for this man's deceit in that very same way. Any time a stranger approaches them and simply smiles, they will remember that that is what the defendant did to them. Anyone tells them they are worthy and loved, they will question if it's just a ploy to break them down and take them over.

Tr. Sentencing Hr'g 31-34, ECF No. 222.

What sentence ought he receive?[2]

The government recommended a sentence of thirty years imprisonment.  Abraham's counsel argued for the minimum mandatory fifteen years.

Judges are advised to begin a sentencing analysis by referring to the United States Sentencing Guidelines.  See Gall v. United States, 552 U.S. 38, 49 (2007) (calling the sentencing guidelines a "starting point" and "initial benchmark"); see generally United States v. Booker, 543 U.S. 220, 245 (2005). Here, the Court's probation office, after consulting with the government and (properly) disallowing most of Abraham's objections, calculated a guideline sentencing range of 360 months to life.  See Presentence Investigation Report ("PSR") 28.

## I.   The "Bottoms"

The PSR captures the evidence at trial with substantial accuracy.

Abraham began his operation of sex trafficking in approximately January of 2012 and continued through at least

---

[2] I recognize it is poor form to issue such a sentencing memorandum after sentence has been imposed and an appeal taken, lest it be seen as a brief in support of the action taken. Gurley, 869 F. Supp. 2d 95, 97 (D. Mass. 2012). That risk is minimal here as the Court's reasoning was fully explicated during the sentencing hearing, and I write only to set forth my views on a matter of importance to our sentencing system.

August of 2016.  Id. ¶ 8.  One of Abraham's main recruitment tools was to contact targets over Facebook, promising them drugs and a free place to stay, and often expressing interest in dating these women.  Id. ¶ 9.  Abraham tended to choose vulnerable women, many -- though not all -- already addicted to drugs.  Id.

Once women came to his house, Abraham would use violence, threats and the supplying or withholding of drugs to induce and coerce them into engaging in prostitution.  Id. ¶¶ 8-9.  He would advertise on Backpage.com, choose where the women worked, and give them nightly quotas.  Id. ¶ 10.  If the women met their quota, he would often reward them with extra drugs, but would beat them and withhold drugs if they failed.  Id. ¶¶ 10-11.  Abraham also forced the women to follow his rules, which included staying in his house during the day, turning over all money they made, and not speaking to other men, and would beat them or withhold drugs if they disobeyed him.  Id. ¶ 11.  He also made others watch the beatings when he was displeased with one of the women.  Id.

The jury found beyond reasonable doubt that Abraham had victimized four women through his criminal sex trafficking: J.N., K.G., T.B., and E.S.

Abraham first reached out to J.N. by promising her that she could dance at a strip club he owned, and she eventually agreed

to join him at his home, believing she would be his girlfriend.
Id. ¶ 13.  Instead, Abraham raped her and forced her to engage
in prostitution.  Id. ¶¶ 13-14.  Abraham would regularly beat,
choke, and slap J.N. and would threaten her with his pit bull,
and, at one point, J.N. witnessed Abraham beat a woman so badly
that her hair was stained red with blood.  Id. ¶ 14.

When J.N. told Abraham that she was planning to leave the
house, he invited over three friends[3] who took turns beating and
raping her.  This assault ended with Abraham putting out a lit
cigarette on J.N.'s face, for which she eventually required
medical treatment.  Id.  Abraham then got J.N. high and left her
at a hotel, after which she made her way back to her home in
Maine.  Id.  This gang-rape formed the basis for the jury's
determination that Abraham was a "leader or organizer" of at
least three others in conducting his crimes of sex trafficking.
Tr. Sentencing Hr'g 10.

As he did with J.N., Abraham first reached out to K.G. over
Facebook and posed as a potential suitor before bringing her
into his operation as a prostitute.  PSR ¶ 17.  While at
Abraham's home, K.G. often saw or overheard his attacks on other
women, once witnessing a beating so severe that the victim was

---

[3] There was evidence at trial that Abraham had invited "four
or five" friends over but the jury found him to be the "leader
or organizer" of at least three.  The jury verdict governs.  See
infra pp. 9-10; Section II.

choking and coughing up blood.  <u>Id.</u> ¶ 18.  Abraham also beat
K.G. so badly that she had to seek medical care for a bruised
rib, and when she attempted to return to the house to collect
her belongings he threatened to shoot her.  <u>Id.</u>  K.G. was not
only a prostitute, but also a "bottom" in the trafficking
operation, supervising the other women, preparing them for
"dates," and telling Abraham when they broke his rules.  <u>Id.</u>
¶ 19.

Abraham first met the third victim, T.B., in Maine, invited
her to his house, and pressured her to engage in prostitution
when she arrived.  <u>Id.</u> ¶ 21.  Like, K.G., T.B. worked as one of
Abraham's "bottoms" during her time there.  <u>Id.</u> ¶ 26.  T.B. was
a frequent victim of Abraham's abuse.  He regularly hit her and
threatened her with a firearm, and engaged in severe emotional
abuse, once forcing her to wear a dog collar and eat out of a
dog bowl when she was "disobedient."  <u>Id.</u> ¶¶ 23-24. On another
occasion, upon finding a text from another man on her phone, he
beat her so severely that she urinated on herself, and he forced
her to sleep in the puddle of her own urine.  <u>Id.</u> ¶ 25.  A few
days after this incident, however, he gave her money and a bus
ticket home, allowing her to leave.  <u>Id.</u>

Abraham's fourth victim, as found by the jury at trial, was
E.S.  <u>Id.</u> ¶ 27.  Abraham contacted E.S. over Facebook while she
was living at a homeless shelter, again posed as a potential

suitor, then brought her to his apartment in Malden, where he pressured her to engage in prostitution.  Id. ¶¶ 27-28.  Abraham hit E.S. on only one occasion because she acted as a "bottom" in the enterprise, but she witnessed his brutal abuse of the other women in his home, including T.B. and E.S.  Id. ¶ 29.  E.S. ran away and returned several times; the last time she ran away, Abraham threatened to kill her and her family.  Id. ¶ 30.

In its briefings and at the sentencing hearing, the government advanced the theory that Abraham's three victims who acted as "bottoms" for his criminal organization ought be added to the rapists of J.N. and counted as participants for the purpose of determining the size of the organization of which he was the organizer or leader.  This would result in a four-level increase under section 3B1.1 of the U.S. Sentencing Guidelines rather than a two-level increase.  See Tr. Sentencing Hr'g 14; Gov't's Sentencing Mem. 3-7, ECF No. 204; see also U.S.S.G. § 3B1.1.  Abraham vigorously contested this theory from a legal perspective, arguing that, as matter of law, coerced victims cannot be considered participants for sentencing purposes.  See Def.'s Sentencing Mem. 9-14, ECF No. 203.

This Court takes no issue with the government's interpretation of the Sentencing Guidelines and their application note on this point.  See Gov't's Sentencing Mem. 5 (citing United States v. Tavares, 705 F.3d 4, 29-30 (1st Cir.

2013)).  The government's problem is that the evidence at trial
was simply insufficient to support it.  The evidence at trial
was that the so-called "bottoms" were thoroughly terrorized and
acted under duress throughout.  They were no more participants
in this horrific organization than was the lowliest submissive
prostitute.  The Court refused even to put this theory to the
jury.

The government indicated at sentencing that the three
"bottoms" nonetheless should be considered participants under a
preponderance of the evidence standard, see Tr. Sentencing Hr'g
17, which is the same determination made by the PSR, see PSR
¶¶ 78, 84, 90, 96.  The government is correct that, post-Booker,
sentencing enhancements need only be proved by a preponderance
of evidence, but this regime is constitutional only because the
guidelines are advisory, rather than mandatory.  See 543 U.S. at
232, 245; United States v. Monteiro, 871 F.3d 99, 116 (1st Cir.
2017).  As the guidelines are discretionary, this Court may, and
does, maintain a consistent policy of submitting sentencing
enhancements to the jury to find beyond a reasonable doubt.  See
United States v. Kandirakis, 441 F. Supp. 2d 282, 321-22 (D.
Mass. 2006) (explaining this Court's consistent procedure since
2006).  Gurley, 860 F. Supp. 2d at 99-102 (same).  See also Gall,
552 U.S. at 66 (Alito, J., concurring) ("In curing the
Sentencing Reform Act's perceived defect regarding judicial

[ 9 ]

factfinding, <u>Booker</u> restored to the district courts at least a measure of the policymaking authority that the Sentencing Reform Act had taken away.").  This practice is informed by the Supreme Court's decision in <u>Cunningham</u> v. <u>California</u>, holding that a state sentencing law violated the Sixth Amendment when it allowed judges to sentence defendants above the statutory maximum upon independent fact-finding.  549 U.S. 270, 274 (2007); <u>see also</u> <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000). Although <u>Cunningham</u> applied only to state guidelines, this Court has long extended its reasoning to the federal sentencing guidelines as well because that case indicates a judge may not impose a sentence higher than is supported by the facts found by a jury.  <u>See</u> <u>United States</u> v. <u>Griffin</u>, 494 F. Supp. 2d 1, 20 (D. Mass. 2007), <u>vacated and remanded on other grounds</u>, 524 F.3d 71 (1st Cir. 2008) (explaining this Court's reasoning regarding the constitutional need for juries to determine sentencing

enhancements).[4]

## II.  Properly Calculating the Sentencing Guideline Range

Here, nothing turns on the level of proof[5] required because, upon this record, there was simply no sufficient evidence at trial of conduct by these "bottoms" other than that extorted by terror.

The sentencing hearing took place on March 3, 2020. Electronic Clerk's Notes (March 3, 2020), ECF No. 215.  At that hearing, this Court calculated the top of the applicable guideline sentence, the average sentence, and the guideline

---

[4] The arc of justice appears to tend inexorably in this direction. In Alleyne v. United States, 570 U.S. 90, 113 (2013), the Supreme Court held – as to mandatory minimum sentences – that any fact increasing the sentencing floor is an essential element of the offense and must be proved to the jury beyond a reasonable doubt upon actual evidence. Thus in United States v. Pizarro, 772 F. 3d 284, 292 (1st Cir. 2014), the First Circuit held that for a drug conspiracy conviction the jury must specifically find the drug quantity reasonably foreseeable to a particular defendant. See Hunter R. Wildrick, One Should Not Pay For All – Drug Quantity Triggering Mandatory Minimums Should Be Individualized in Conspiracy Sentencing, 25 Suff. Jnl. of Trial & App. Adv. 66 (2020).

[5] It is, of course, sophistry to speak of a level of "proof" at a sentencing hearing where the rules of evidence simply do not apply.  Fed. R. Evid. 1101(d)(2).  At sentencing, "evidence" is not truly "evidence," nor are "facts" truly established in any formal sense.  United States v. Green, 346 F. Supp. 2d 259, 280-81 (D. Mass. 2004), vacated in part, United States v. Yeye-Cabrera, 430 F.3d 1 (1st Cir. 2005), vacated and remanded, United States v. Pacheco, 434 F.3d 106 (1st Cir. 2006); see William G. Young, A Lament for What Was Once and Yet Can Be, 32 B.C. Int'l & Comp. L. Rev. 305, 314-18 (2009)(discussing the continuing pernicious effect of the now-advisory Sentencing Guidelines on federal judge fact-finding generally).

range.  Id.  The Court also heard a victim impact statement from

K.G., read by Assistant U.S. Attorney Leah Foley.  Tr.

Sentencing Hr'g 25-29.  At the conclusion of the parties'

arguments, this Court sentenced Abraham to 262 months in federal

custody on each count of conviction, to run concurrently, and to

be followed by 15 years of supervised release.  Id. 53-54.  This

court also imposed a $400 special assessment, plus $5,000, on

each of counts 2, 3, and 6, and restitution to the victims in

the following amounts:  to J.N., $56,000; to K.G., $112,000; to

P.B., $280,000; and to E.S., $280,000.  Id. 54, 57.

    In determining this sentence, this Court was informed by

the sentencing guidelines as a "starting point" and "initial

benchmark," see Gall, 552 U.S. at 49, though it has the

authority to make reasoned departures from these guidelines, see

generally Booker, 543 U.S. at 245.  Informed by the Presentence

Report, see PSR ¶¶ 73-105, this Court calculated Abraham's total

offense level at 40.  See Tr. Sentencing Hr'g 23.  The base

offense level for a violation of section 1591(b)(1), as laid out

in section 2G1.1 of the U.S. Sentencing Guidelines, is 34.  This

Court then added two levels because Abraham was the organizer or

leader of three or more individuals in his criminal activity, in

accordance with section 3B1.1(c).  See Tr. Sentencing Hr'g 13;

supra Section I.  To this offense level of 36, the Court then

added four levels, in accordance with section 3D1.4(a) of the

[12]

U.S. Sentencing Guidelines, because Abraham was found guilty on four counts, and all of them were within four levels of the most serious count.  <u>Id.</u>  This resulted in the combined adjusted level of 40.

This combined adjusted offense level, for an individual such as Abraham in criminal history category I (for no prior criminal history), yields a recommended sentence of 292-365 months.  <u>See</u> U.S.S.G. § 5A Sentencing Table; Tr. Sentencing Hr'g 23-24.  It will be noted that, as properly calculated by the Court, this range encompasses the government's recommended thirty-year sentence.

### III. The Trial Penalty

#### A.    Constitutionality of Section 3E1.1

Abraham did not accept responsibility for his crimes prior to trial and, following his conviction, continued to dispute the truthfulness of his victims.  <u>See generally</u> PSR, Addendum to the Presentence Report 35-47.  In his objections to the PSR, Abraham portrays himself as essentially a businessman with whom all of the victims worked freely and willingly -- a characterization that directly contradicts their testimony at trial, was soundly rejected by the jury as to the four counts of conviction, and seriously undermines his moral responsibility for his actions. <u>See, e.g.</u>, <u>id.</u> at 39-40 (claiming that K.G.'s bruised ribs were the result of her "wrestling" with Abraham and that K.G. and

[13]

T.B. voluntarily joined his "prostitution business"); <u>id.</u> at 43

(arguing that Abraham and K.B. had a "cordial relationship").

The second application note to section 3E1.1 of the U.S.

Sentencing Guidelines explains that the reduction is "not

intended to apply to a defendant who puts the government to its

burden of proof at trial by denying the essential factual

elements of guilt, is convicted, and only then admits guilt and

expresses remorse."  U.S.S.G. § 3E1.1 Application Note 2.  The

narrow exception, according to the note, is when "a defendant

goes to trial to assert and preserve issues that do not relate

to factual guilt (e.g., to make a constitutional challenge to a

statute or a challenge to the applicability of a statute to his

conduct)."  <u>Id.</u>

The First Circuit has held section 3E1.1 constitutional as

a general matter.  <u>See</u> <u>United States</u> v. <u>Paz Uribe</u>, 891 F.2d 396,

400 (1st Cir. 1989) (citing <u>United States</u> v. <u>Henry</u>, 883 F.2d

1010 (11th Cir. 1989) (following the Eleventh Circuit's holding

that "the guidelines merely codify a tradition of leniency and

are not an impermissible burden on the exercise of

constitutional rights")).  In <u>United States</u> v. <u>Munoz</u>, the First

Circuit further clarified that denial of the acceptance of

responsibility credit is not an unconstitutional penalty for

going to trial.  36 F.3d 1229, 1236-37 (1st Cir. 1994) (citing

<u>Corbitt</u> v. <u>New Jersey</u>, 439 U.S. 212, 218 (1978)); <u>see also</u>

[14]

<u>United States</u> v. <u>Rosario-Peralta</u>, 199 F.3d 552, 570 (1st Cir. 1999).

In his briefings, Abraham makes an inventive but foredoomed argument that he ought be granted the three level acceptance of responsibility credit and that to withhold that credit is unconstitutional as applied to his case because the jury found him not guilty on one of the five counts.  <u>See</u> Def.'s Suppl. Mem. 3, ECF No. 206-1.  Abraham argues that when a defendant has the option of pleading guilty to all counts or going to trial on all counts, any penalty for failing to "accept responsibility" for the conduct of which he is, in fact, not guilty would be unconstitutional.  <u>See</u> Tr. Sentencing Hr'g 7.  To hold the application of section 3E1.1 constitutional in this case, Abraham argues, would condone allowing the government to "coerce a defendant into pleading guilty to an offense he did not commit" when there are other charges pending.  Def.'s Suppl. Mem. 3.

Here, Abraham has not actually argued, nor has he produced evidence, that he ever contemplated pleading not-guilty to Count 2 of the indictment (on which he was found not guilty) and guilty to the other counts, or that he discussed such an option with the government.  <u>See</u> Def.'s Suppl. Mem. 3 (phrasing the potential constitutional problems as applied to a hypothetical defendant, instead of Abraham himself).  Putting that aside, the

[15]

decision by the government to offer a defendant the choice to plead guilty either to all charges or to no charges is an executive decision not generally subject to judicial review, unless it is constitutionally coercive.  See Berthoff v. United States, 140 F. Supp. 2d 50, 61 (D. Mass. 2001) ("Although charge bargaining is an inescapable concomitant of any criminal justice system that encourages pleas, it is thought acceptable because we expect the Executive to enforce the laws, and thus to determine who to charge, with what, and when to drop, dismiss, or nol pros a pending charge.").

The Court acknowledges Abraham's concern over the possibility of abuse by prosecutors.  It is for precisely this reason that this Court, at sentencing, will not consider acquitted conduct and confines its sentences to those facts either admitted by the defendant or found beyond a reasonable doubt by the Court or jury upon actual evidence.  The First Circuit has, in the past, upheld a decision of this Court denying acceptance of responsibility credit when a defendant pled guilty to an indictment but still went to trial to contest the weight of drugs that could be properly attributed to him, a scenario not dissimilar to the hypothetical Abraham argues here. United States v. Garrasteguy, 559 F.3d 34, 37-40 (1st Cir. 2009).  It is certainly possible that were a defendant to provide specific evidence indicating that the government, aware

[16]

of such precedent, had structured an all-or-nothing plea deal in a manner that is part of an overall strategy designed to "overbear[] the will of the defendant," Brady v. United States, 397 U.S. 742, 750 (1970), action by the Court would be necessary.  Abraham has not presented any such evidence.

Abraham's constitutional argument, therefore, relies on a counterfactual scenario where he chose to plead guilty to those charges but not count 2, which is far too speculative on these facts to support his challenge.  As it is, pursuant to Supreme Court and First Circuit case law, the Constitution does not require granting him credit for acceptance of responsibility solely because the jury acquitted him on one of the five counts.

## B. The Mandate of the Sentencing Reform Act

Analysis cannot end here.  There is also the statutory mandate to consider.  Under the Sentencing Reform Act of 1984, 98 Stat. 1987, all criminal sentences are required to be "sufficient, but not greater than necessary" to comply with the goals of sentencing: reflecting the seriousness of the offense, promoting respect for the rule of law, providing just punishment, providing deterrence, protecting the public, and providing the defendant with needed educational training and medical care.  18 U.S.C. § 3553(a), (a)(2).

Much of this Court's concern is driven by how section 3E1.1 is applied in practice, and how it effectively acts as a "trial

[17]

penalty."  This Court has long noted that those who exercise their constitutional right to a trial before a jury of their peers suffer a more severe penalty than those who cop a plea, ostensibly because we wish to provide leniency to those others who "accept responsibility," but really because they have inconvenienced the government by forcing it to undergo the expense and uncertainty of a trial.  See United States v. Moore, No. CR 1:00-10247-WGY-1, 2018 WL 5982017, at *5 n.2 (D. Mass. Nov. 14, 2018); see also Berthoff, 140 F. Supp. 2d at 57. Significant scholarship confirms these concerns are not merely theoretical.

A recent statistical analysis of federal sentences looked at 207,352 federal criminal convictions from 2006-2008 available in a database maintained by the United States Sentencing Commission to examine whether defendants suffered a penalty for going to trial, and if so, its extent.  See Andrew Chongseh Kim, Underestimating the Trial Penalty: An Empirical Analysis of the Trial Penalty and Critique of the Abrams Study, 84 Miss. L.J. 1195, 1236 (2015).[6]  The study found that, after controlling for

---

[6] The above study was written as a peer response to a separate study that found there was actually a penalty for defendants pleading guilty, if discounted against the probability of success at trial.  See Kim, supra, at 1198 (citing David S. Abrams, Putting the Trial Penalty on Trial, 51 Duq. L. Rev. 777 (2013)).  In particular, the Kim paper noted that the population of defendants who plead guilty almost certainly does not have the same likelihood of success at trial

the two-to-three point reduction provided by section 3E1.1,
defendants convicted at trial received a sixty-four percent
longer sentence than similar defendants who pled guilty to
similar crimes.  Id. at 1243.  Using the same dataset, the
author calculated the trial penalty without the section 3E1.1
reduction at twenty-eight percent, which shows that section
alone contributed to a thirty-six percent difference in
sentences for his dataset.  Id.

Recent data also indicates that a mere three percent of
defendants go to trial.  U.S. Sent'g Comm'n, 2017 Sourcebook of
Federal Sentencing Statistics S-25 fig. C (2017), https://www.
ussc.gov/sites/default/files/pdf/research-and-publications/
annual-reports-and-sourcebooks/2017/2017SB_Full.pdf; see also
Lafler v. Cooper, 566 U.S. 156, 170 (2012); Garcia v. Herbert,
No. 02-CV-02052, 2018 WL 6272778, at *31 (E.D.N.Y. Nov. 30,
2018).

In practice, this means that the section 3E1.1 reduction
is the norm in all but a small subset of cases because it is
applied almost automatically.  See U.S.S.G. § 3E1.1 Application
Note 3 ("Entry of a plea of guilty prior to the commencement of

---

as those who go to trial, id. at 1229, and that a proper
analysis of sentences must include defendants who receive
probation instead of prison time, id. at 1225-27.  Reviewing the
data of the original paper, Kim concluded that the Abrams study
greatly underestimated the magnitude of the penalty, even if
discounted by the chance of success.  Id. 1246.

trial combined with truthfully admitting the conduct comprising

the offense of conviction . . . will constitute significant

evidence of acceptance of responsibility . . . .").  As another

scholar has argued:

> It is not clear, however, why we should privilege the
> sentences received by the tiny minority of defendants
> who go to trial as the "correct" sentences, from which
> the sentences received by defendants who plead
> represent an unduly lenient departure.  In a system
> where ninety percent or more of cases end in a
> negotiated disposition, it is unclear why the
> "discounted" punishment imposed in that ninety percent
> of cases should not rather be considered the norm.
> Where almost no one pays the "manufacturer's suggested
> retail price," and almost everyone buys the item at a
> "discounted" price, no one really gets a "bargain,"
> and the product's real price is what is actually
> charged in the marketplace.

Gerard E. Lynch, Screening Versus Plea Bargaining: Exactly What

Are We Trading Off?, 55 Stan. L. Rev. 1399, 1401 (2003).

In addition to the problem that these incentives encourage

all defendants to give up their constitutional right to trial,

there is empirical evidence that the trial penalty is so large

that it is encouraging actual innocents to plead out.  See John

H. Blume & Rebecca K. Helm, The Unexonerated: Factually Innocent

Defendants Who Plead Guilty, 100 Cornell L. Rev. 157, 180

(2014); Kim, supra, at 1245 ("[F]or all types of crimes, the

average federal defendants who went to trial would have been

much better off pleading guilty, even after accounting for their

chances for acquittal.").  With the advent of sophisticated

investigation techniques such as DNA analysis, many convictions in this country have been overturned upon convincing proof that the defendant simply could not have been the one to commit a crime, showing that our criminal justice system is still far from perfect in discerning the innocent from the guilty.  See Innocence Project, DNA Exonerations in the United States, https://www.innocenceproject.org/dna-exonerations-in-the-united-states/ (last accessed October 28, 2020) (noting that DNA testing has exonerated innocent defendants after conviction in 375 cases).  In forty-four of these 375 cases the defendant pled guilty to a crime they did not commit.  Id.

Section 3E1.1 is only one of many factors that can lead an innocent defendant to plead guilty and is not applicable in state court.  See Nat'l Ass'n of Crim. Def. Law., The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It 17-18 (2018) [hereinafter Trial Penalty] (examining cases where innocent defendants pled guilty for a variety of reasons, including charge bargaining and withholding of exculpatory evidence by prosecutors).  Yet section 3E1.1, as currently applied, so incentivizes defendants to plead guilty that it must be considered a major factor in the pressure on defendants to forego their constitutional right to trial, particularly in convictions for minor crimes where it can make the difference between prison time and probation.  See

Trial Penalty, supra, at 39-40 n.171 (citing U.S.S.G. § 5C1.1)

(explaining that if the guidelines range is reduced to Zone A or

B of the Sentencing Table, U.S.S.G. § 5A, the judge is

authorized a guidelines range of no imprisonment or probation,

respectively).  Ninety-seven percent of defendants charged in

federal courts plead guilty.  U.S. Sent'g Comm'n, supra, at S-25

fig. C.  As a result, approximately ninety-six percent of

sentenced defendants received either the two- or three- levels

off their guidelines calculation for "acceptance."  Id. at S-44

tbl. 18.

The sentencing range counselled by the guidelines ought

encompass the range of sentences that the Sentencing Commission

deems "sufficient, but not greater than necessary."  See

§ 3553(a), (a)(2).  Yet this is not at all the way it works in

practice.  Take Abraham's case.  Had he pled guilty, his

guideline range would have been 210-262 months -- surely a hefty

sentencing range "sufficient, but not greater than necessary" to

accomplish the goals of federal sentencing.  **Solely because he

went to trial, however** -- a jury trial guaranteed by Article III

of the United States Constitution -- the recommended sentencing

range is 292-365 months.  This simply cannot be.  These

strikingly disparate sentencing ranges (which do not even come

close to overlapping) simply do not square with the statutory

mandate -- "sufficient, but **not greater than necessary"**

[22]

(emphasis supplied) -- where the Commission counsels that the huge bulk of similarly situated defendants ought be sentenced within the lower range.

**IV.  CONCLUSION**

This Court varied downward to sentence Abraham to 262 months in prison.  Not everything that is constitutional is just.

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE